## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

JUANITA GARCIA,

        Plaintiff,

v.                                  No. CV 15-00005 WJ/SCY

THE CITY OF FARMINGTON,

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court upon Defendant The City of Farmington (the "City")'s Motion for Summary Judgment (**Doc. 74**).  Having reviewed the relevant pleadings and the applicable law, the Court finds that Defendant's Motion for Summary Judgment is well taken, and is therefore **GRANTED**, as herein described.

## BACKGROUND[1]

This lawsuit arises out of Plaintiff Juanita Garcia's ("Garcia") termination of employment by the City of Farmington ("City") on February 10, 2014.  Garcia, who is female and Hispanic, was fired for failing to maintain proper and safe control of the operating pressure at one of the City's combined-cycle steam and gas power plants.[2]  When she was terminated, Garcia held the position of Operator Technician I at the Farmington Electric Utility System ("FEUS"), a position she held since about December 2012.  She was the first female Operator hired by the City.

---

[1] The facts are taken from the parties' briefs and are supported by evidence in the record as stated by the parties. References to the supporting exhibits are omitted, since they can be found in the parties' briefs.  Although there were many disputed facts, to the extent that a "disputed" fact is included in the Court's recitation of the facts, the Court has found there was not a legitimate dispute.   Additionally, both parties raised materiality/relevancy objections to each other's facts.  The facts included here have been deemed to be material by the Court, and are not disputed unless otherwise noted.

[2] The operation of the City's power plant is further explained on page 2 of this Memorandum Opinion and Order.

FEUS is a City department that generates and sells electricity.  In 2009, FEUS underwent operational changes, primarily to enable the City to operate its plants with a "one man crew" with no assistance.  The essential job duties of an Operations Technician I include operating a variety of power and maintenance equipment without assistance; operating the computer system that controls the plant, the Distributed Control System ("DCS"); logging operational conditions and making corrections; notifying a supervisor of abnormal conditions and defective equipment; and monitoring operating parameters.  When the City hired Garcia, she had almost 30 years of experience in the power plant industry.

FEUS owns and operates the Animas Power Plant ("APP").  APP is a combined-cycle plant that uses both gas and steam turbines to produce electricity.[3]  A Heat Recovery Steam Generator ("HRSG") captures heat from the gas turbine, creates steam, and delivers it to the steam turbine.  APP is equipped with gas turbine exhaust bypass dampers to enable simple-cycle operation of APP and to facilitate plant startup.  The damper can control the amount of exhaust gas entering the HRSG.

APP uses pressure to heat water to produce electricity.  Controlling pressure is achieved through a steam turbine bypass valve, which APP personnel refer to as a "sky valve."  The sky valve is operated during startup of the plant and during initial operation of the HRSG.  The sky valve opens to release steam and heat into the air.  This ensures the steam turbine and the HRSG do not come up to temperature and pressure too quickly.  Proper operation of the sky valve is important because during a startup, the HRSG can generate more steam than the steam turbines will be able to accept without causing damage to the steam turbines.

---

[3] APP is also capable of operating in a simple cycle mode, where the gas turbine drives an electrical generator to produce electricity.

The sky valve is operated remotely using the DCS.  The DCS also records data about the sky valve, HRSG diverter damper, and steam turbine flow rates.  The sky valve can be placed in manual or automatic by checking the appropriate box on a computer screen.  An "A" or an "M" appears on the screen so that the operator knows what function the sky valve is operating within.  In manual, the operator specifies a percentage opening value for the sky valve (also referred to as a "setpoint").  As an example, if the operator inputs a setpoint of 420, the sky valve remains closed until the pressure reaches 420 pounds per square inch ("psi").  In automatic, the operator specifies a pressure and the valve modulates to achieve this pressure.

From time to time, APP is shut down for maintenance or other reasons.  After a scheduled shutdown, a cold startup occurs, which means the gas and subsequently the steam cycles must be started to full operation.  Proper startup from shut down to generating power is an essential part of being able to operate APP.  On January 21, 2014, Garcia's direct supervisor and the Generation Superintendent, Richard Miller, advised Garcia that she was to perform a cold startup of APP.  Also present for the startup were Trainees Steven Warner, John Hill, and Karen Reyes, who were there to learn, observe, and assist.  Garcia was to start APP at 5 megawatts[4] with the diverter damper open 100%.  According to the City, Garcia failed to properly operate the sky valve on January 21, 2014, allowing the pressure to rise too quickly to a dangerous level of 451 psi  Normal startup pressure at APP ranges from 300 to 375 psi, with normal operating pressure at 405 psi.  Garcia points out that none of APP's safety valves ever lifted, and that no equipment or personnel were injured during the startup.

The City states this was the second time Garcia failed to control pressure during a startup at FEUS.  About two years prior, on December 28, 2012, Miller had to tell Garcia what to do during a startup at APP when pressure reached 424 psi.  Specifically, Miller corrected Garcia on

---

[4] Megawatts refers to the amount of gas being burned and measures the electricity being produced.

how to properly operate the sky valve to put it in automatic mode in order to bring pressure down after it rose to 424 psi because she did not recognize the pressure was rising.[5]  Garcia argues 424 psi is not dangerous because it is only 4 off the setpoint of 420 psi.  Miller testified that the pressure reaching 424 psi could potentially be dangerous if not corrected, and that on that day it was dangerous because he could see the pressure was not being corrected, and without his intervention, pressure would have continued to climb with possible catastrophic consequences. The City's expert, Mark Fecke, agrees that the pressure reaching 424 psi was dangerous.

Miller documented the December 28, 2012 incident in a memorandum the same day.  He wrote, "On 12/28/12 during startup I had to tell Juanita Garcia what to do to correct a dangerous situation that she did not recognize of excessive pressure (424 psi) on the main steam header." Miller added additional details to the memorandum on January 28, 2014.  He did not intend his statement to Garcia on December 28, 2012 to be disciplinary.  He and Garcia never discussed the incident again and Garcia was never disciplined for the incident.

In Garcia's annual employee evaluation for 2012–2013, the City ranked her as "satisfactory" in each category except safety, where she received a higher rating of "above average."  At the end of the evaluation there is a space where Miller could note "areas where the employee's performance should be improved," but the space is left blank.

Garcia disagrees with the City's reasons for firing her, and claims the January 21, 2014 incident was not her fault.  She argues the sky valve controller malfunctioned, which is why pressure exceeded 450 psi.  In a pre-termination meeting on February 3, 2014, Garcia offered a litany of explanations for the January 21 incident.  Garcia first explained that she had to leave the control room because Warner and Hill, who were supposed to be assisting her, did not respond to her when she called them over the intercom.  Garcia states she left the control room to locate

---

[5] Miller told Garcia to "put [the sky valve] in auto."

Warner and Hill, and when she returned she immediately noticed the pressure climbing too rapidly. She claims that as soon as she attempted to remedy the situation, the sky valve malfunctioned by switching from manual to automatic on its own as pressure continued to rise. Garcia states there was no way to control the sky valve and the pressure continued to climb. If she attempted to input a pressure setpoint, the sky valve "would not take the number." As she was attempting to rectify the pressure problem, Warner and Hill stood at a distance mocking her. Reyes testified similarly, stating the sky valve malfunctioned, and emphasizing the lack of support and taunting from Warner and Hill. Garcia also states that after the pressure incident, Miller "chewed her out" in front of other APP personnel in an attempt to embarrass her. She claims Warner and Hill were never investigated or disciplined for their behavior.

According to Garcia, the diverter damper was not working either and was "sticking" so she could not place it in manual. She manually went to the diverter damper and was able to close it. Garcia also attempted to utilize the steam turbines in an effort to divert some of the steam pressure. She claims she was eventually able to bring pressure down to an acceptable level despite the sky valve and diverter damper controls malfunctioning.

Garcia never created a work order for the sky valve, despite her job requirement of documenting defective equipment. She says the malfunction lasted only two to five minutes, which is why she did not create a work order. She did not indicate there was any problem with the sky valve until, at the earliest, several days after the startup at the pre-termination meeting.[6] No one from the City examined the sky valve, because Garcia had not indicated there was a problem with it until over a week after the incident, and APP had subsequently been started up with no problems. Garcia admits that failing to create a work order is a mistake or an omission

---

[6] Robert Mayes, City Manager, testified that he was not aware of the alleged sky valve malfunction until the advisory arbitration in November 2014.

and possibly subject to discipline.  Garcia did, however, create a work order for the diverter damper, which is the other piece of equipment she alleged malfunctioned.

The following morning, on January 22, 2014, another operator was able to successfully utilize the sky valve, and no issues were reported with the sky valve.

Jim McNicol, Assistant Utility Director, conducted an investigation into the January 21, 2014 startup.  McNicol interviewed APP personnel who were present during the startup, and he examined Miller's report of the incident as well as the City's employee policies and procedures. Regarding Garcia and Reyes' allegations that Warner and Hill laughed at Garcia during the startup, McNicol requested that the City's Human Resources department assess those allegations. He felt that he and Miller should not be the ones to evaluate the interpersonal elements and it would be more appropriate to remain focused on the operational issues that day.  McNicol concluded that based on the two episodes of failing to control pressure (and failing to recognize pressure rising in the first place), Garcia could no longer safely and independently operate APP. McNicol found she was unable to perform essential job duties, such as operating APP without assistance.

On January 31, 2014, Electric Utility Director Mike Sims and McNicol recommended Garcia's termination, concluding generally that she could not perform her job duties safely, which negatively implicated the safety of APP personnel and property.  More specifically, despite nearly five years on the job, Garcia demonstrated an inability to independently and safely operate APP on two occasions.  Sims and McNicol determined it was unlikely after nearly five years that Garcia could be further trained to competently operate APP.  They scheduled a pre-termination meeting with Garcia pursuant to the City's policies.

Sims also recommended Garcia's termination in a letter to City Manager Robert Mayes on February 4, 2014, after a pre-termination meeting.  Sims' first justification for Garcia's termination was her failures to control pressure at APP during the startups on December 28, 2012 and January 21, 2014.  Second, Sims concluded Garcia did not understand how to operate APP. Garcia failed to recognize and take corrective action for excessively high and potentially dangerous steam pressure conditions.  Sims concluded, after speaking with Garcia about her version of the events during the startup, that she did not understand operation of the sky valve and had no idea how it was being operated on the day in question.  Garcia had nearly five years' experience, had received years of training, witnessed and participated in numerous startups, but nonetheless was unable to control pressure not once, but twice.  Sims also considered DCS control screen main steam pressure trend plots and McNicol's investigative findings.  The specific grounds for the recommendation of termination were set forth in the City's Personnel Rules regarding negligence in the performance of a duty; incompetence, inefficiency, failure to perform adequately the essential functions of the job; and failure to meet prescribed standards of work.  Sims also noted that Garcia's "attitude of divisiveness" had become a problem.

The City's expert, Mark Fecke[7], agreed with the City's findings.  He concluded the sky valve did not malfunction.  He reviewed and analyzed raw data from the DCS from January 21, 2014.  He points out that the DCS was functioning properly and recorded no malfunctions on January 21, 2014.  He further concluded Garcia failed to control pressure, the failure to control pressure was dangerous, and Garcia had a duty to report the alleged sky valve malfunction.

---

[7] Mark Feck of Exponent Engineering and Scientific Consulting is a licensed mechanical engineer.  Plaintiff has not raised any challenges to Fecke's expert testimony under *Daubert* or otherwise, therefore the Court considers Fecke qualified to give opinions in this matter.  Because Defendant has not provided material on Fecke's background, the Court conducted a brief online search and determined Fecke specializes in the operation, maintenance, repair, and design of both large and small combustion systems including: boilers, burners, kilns, dryers, furnaces, ovens, oxidizers, process heaters, heat exchangers, incinerators and steam engines.

Failure to control steam pressure could have resulted in an explosion, which could have injured or killed APP personnel.  Fecke explains the error Garcia committed was placing the sky valve in automatic with a setpoint of 420 psi, which was too far above the actual pressure of 300 psi to properly control the pressure.  Furthermore, Garcia committed an error when she left the control room to manually activate the damper as steam pressure continued to rise.  Fecke explains:

> Lastly, between 14:30:00 and 14:30:30, the DCS data shows that the position of the HRSG damper changes from 100 percent open to 5 percent open. As Ms. Garcia stated, she and Ms. Reyes left the control room in order to manually actuate the HRSG damper.  Thus, Ms. Garcia left the control room when the steam header pressure was continuing to increase and, at its current rate of the pressure rise (almost 30 psig/min, as calculated by the pressure entries at 14:39:00 and 14:39:30 in Table 1), was less than a minute from lifting the first pressure relief safety at 475 psig.  If not for the Sky Valve operating correctly in automatic mode, as it had been from the time it was likely placed into automatic mode by Ms. Garcia (14:35:30-14:36:00), Ms. Garcia would have lifted at least the first pressure relief safety and would not have been in the control room. Therefore, her actions imply that she was neither actively monitoring the steam header pressure nor understanding the severity of the situation.

(Motion, Defendant's Ex. 8 at page 24).  Fecke also explains while it is possible for the DCS to fail to record data, there are no indications the DCS failed on January 21, 2014.  Garcia has not disclosed an expert witness of her own, and instead testifies that she and Reyes disagree with Fecke's opinions.  Garcia states it was not operator error to leave the control room to close the diverter damper because the pressure was still rising and the sky valve was not working.

With regards to the December 28, 2012 event, Fecke concluded Garcia likewise failed to control steam pressure, which presented a safety risk.  Garcia failed to appreciate the safety risk or disregarded the risk during the startup.

Garcia claims she was never trained how to conduct a startup at 5 megawatts with the diverter damper 100% open, no City operating procedure explained such a startup, and in October 2013 Miller denied her the opportunity to observe such a startup.  She claims this

treatment was on account of her gender and national origin.  It is undisputed that on October 24, 2013, Warner, a Trainee, successfully conducted a startup of APP at 5 megawatts and the diverter open 100%.  APP was started up this way because the damper had been sticking.  Miller instructed Garcia to go to another control room two stories down from the turbine deck, while Warner conducted the startup.  Garcia was unable to observe Warner startup APP because she was in the ABB room.  She could not observe him manipulate the diverter or operate the sky valve.  She claims she was intentionally prevented from participating in the startup on this date, but does not provide any evidence establishing this.

On February 4, 2014, Garcia wrote an e-mail to the union.  She claimed the City was biased against her and that Miller falsified records and made false accusations against her in order to fire her.  She stated Miller embarrassed and belittled her in front of others to make her look incompetent.  She took issue with the fact that Miller was not present to assist her during the startup on January 21.  She claimed Miller directed other employees to help other Operators, but did not do so for Garcia.  She also claimed Miller directed her to run the diverter damper at 100% open and 5 megawatts that day, which was abnormal and he was aware she never operated the plant that way before.  However, she explains she did not raise the sky valve malfunction in the e-mail because it had stopped malfunctioning.

Garcia claims there were other circumstances where pressure at APP reached 450 psi, but those employees responsible were not fired as a result.  She claims there were other instances where the safety valves at APP lifted due to high pressure, but those employees responsible were not disciplined either.  Sims explained these employees were not disciplined because the pressure issues were not due to operator error.  Garcia also highlights an incident that occurred in either 2005 or 2006 at Bluffview, another FEUS power plant, where a male Operator failed to control

"drum level" during a startup.  The Operator was demoted and required to complete additional training.  Sims testified that the male Operator was unable to complete training, so the City ultimately fired him.  Sims explained that he made the recommendation to terminate the male employee, and his supervisor (Maude Grantham-Richards) terminated the male employee.

Mayes independently reviewed the City's investigative findings, and upheld Sims' recommendation for termination.  He notified Garcia of her termination on February 10, 2014.  Mayes elaborated that Garcia's termination was based on the two demonstrations that Garcia could not manage a critical aspect of her job requirement, which was to operate the APP without assistance.  He noted that without intervention on December 28, 2012 and January 21, 2014, pressure would have continued to rise to dangerous levels, jeopardizing equipment and safety of APP personnel.  Mayes agreed with Sims and McNicol that Garcia made the same operational errors on December 28, 2012 and January 21, 2014.

Garcia agrees discipline is possible based on what transpired on January 21, 2014.  She further concedes she made five mistakes or omissions on January 21, 2014.[8]  First, she admits the steam pressure increased too fast.  Second, she agrees that pressure of 451 psi was too high.  Third, she recognizes her failure to create a work order for the sky valve, which she agrees should have been done.  Fourth, she did not communicate the alleged sky valve malfunction to anyone.  And fifth, she failed to note the sky valve malfunction in the operations log book.  Garcia herself admitted that discipline is possible as a result of these failures.  Likewise, she agrees the DCS accurately records data about the sky valve, provided the DCS is functioning properly.

---

[8] The parties quibble over whether Garcia admitted to "mistakes" or "omissions."  The distinction does not matter. What matters is that Garcia admitted to five areas of conduct that she agrees are subject to discipline.

In support of her retaliation claims, Garcia points out that she filed a lawsuit against the City in the United States District Court for the District of New Mexico, 12-CV-00383, on April 13, 2012 alleging discrimination and retaliation related to the terms and conditions of her employment. ("*Garcia I*").  She states that her termination occurred within months of the depositions of City personnel in *Garcia I*, which supports an inference of retaliation.  The deposition pages Garcia relies upon to support this contention show that the depositions all occurred in January 2016–about two years after she was fired.

As noted above, although Plaintiff had already filed suit against the City alleging claims of discrimination and retaliation, instead of amending her existing lawsuit to assert new claims, Plaintiff brought this lawsuit on January 5, 2015, filing her Complaint for Damages from Title VII Gender Discrimination, National Origin Discrimination, Retaliation, and Hostile Work Environment ("Complaint").  On December 4, 2015, the Court entered its Memorandum Opinion and Order Granting Defendant's Motion to Dismiss Plaintiff's Hostile Work Environment Claims and Claims Preceding the Settlement Agreement and Denying Defendant's Motion to Dismiss Pursuant to the Collective Bargaining Agreement (Doc. 36).  The City filed a Motion for Summary Judgment (**Doc. 74**) on August 4, 2015 as to the remaining counts in the Complaint. Garcia filed her Response (**Doc. 83**) on September 12, 2016.  The City filed a Reply (**Doc. 87**) on October 4, 2016.

## LEGAL STANDARD

### I.     Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 922 F.3d 1033, 1036 (10th Cir. 1993) (citations omitted). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

## II.     Title VII Discrimination

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Where, as here, a plaintiff seeks to establish a Title VII discrimination claim through

indirect or circumstantial evidence, courts apply the framework from *McDonnel Douglas Corp v. Green*, 411 U.S. 792 (1973).  In order to make a prima facie claim for wrongful termination on the basis of gender or race, a plaintiff must prove that: "(1) [s]he belongs to a protected class; (2) [s]he was qualified for h[er] job; (3) [and] despite h[er] qualifications, [s]he was discharged." *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000).  If the plaintiff meets this burden, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the termination that is not facially prohibited by Title VII." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (quotation marks omitted). Once the defendant does this, then it is the plaintiff's burden to show that the stated reason is "a pretext for racial discrimination." *Id.*

Pretext is demonstrated by showing the employer's explanation for an employment decision was false or so plagued with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" as to be unworthy of credence. *See, e.g., Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, 256, (1981).  There are three typical methods of proving pretext: (1) evidence that the defendant's stated reason for the adverse employment action was false; (2) evidence that the defendant acted contrary to a written policy prescribing the action to be taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to the employer's practice when making the adverse employment decision affecting the plaintiff. *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014).

It is not the employee's subjective evaluation of her performance that is relevant in determining pretext.  Rather, the court must look at the facts as they appear to the person making the employment decision.  *Kendrick*, 220 F.3d at 1230.

### III.    Title VII Retaliation

42 U.S.C. Section 2000e–3(a) states that it is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]."  A plaintiff must establish that retaliation was the "but-for" cause of the adverse employment decision.  *Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013).  To establish a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004).  If the plaintiff is able to establish all three of those elements, the burden then shifts to the defendant to show that it had a legitimate, nondiscriminatory business reason for its decision.  *See id.*  "The plaintiff must then respond by demonstrating that the employer's asserted reasons for the adverse action are pretextual."  *Id.*

"[T]emporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation."  *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009).

### DISCUSSION

### I.    Motion for Summary Judgment on Garcia's Gender and National Origin Discrimination Claims

In Counts I and IV of her Complaint, Garcia alleges she was subject to discrimination and wrongfully terminated on account of her gender and national origin.  Because Garcia has not alleged direct evidence of discrimination, her claims are governed by the *McDonnell Douglas* burden shifting analysis that is applicable to Title VII cases. *See Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir. 2000) (noting that *McDonnel Douglas Corp v. Green*, 411 U.S. 792 (1973)

provides the framework for analyzing circumstantial evidence under Title VII).  The City argues it has met its burden of showing it had a legitimate, nondiscriminatory reason for firing Garcia, and there is no genuine issue of material fact that Garcia failed to perform her job duties.  Lastly, the City claims Garcia cannot establish pretext.  The Court agrees, and addresses each argument in turn.

### 1.   Legitimate, Nondiscriminatory Business Reason

For the purposes of its Motion, the City assumes Garcia can establish a prima facie case of discrimination.  The City must therefore proffer a legitimate, nondiscriminatory reason for firing Garcia.  *Salguero*, 366 F.3d at 1175.  The City asserts that Garcia was fired for failing to properly startup the plant on January 21, 2014 and December 28, 2012, when she allowed steam pressure to reach potentially hazardous levels and did not recognize the problem without intervention from others.  She was fired because of her inability to perform essential job functions, such as independently operating APP.  Her failures placed herself and other FEUS employees and property at risk.

The City relies upon *Zamora v. Bd. of Educ. for Las Cruces Pub. Sch.*, 553 F. App'x 786, 790 (10th Cir. 2014), where the Tenth Circuit affirmed summary judgment for the employer because the employer articulated a legitimate, nondiscriminatory business reason for firing the plaintiff.  An internal investigation found the employee plaintiff violated his employer's policies, and the employee was fired.  *See id.*  The employer's investigative report was offered to show the employer believed it had legitimate reasons for firing the employee.  *See id.*

The City argues that like the employer in *Zamora*, it based its decision to fire Garcia on multiple reports and an investigation concluding Garcia was unable to perform crucial aspects of her job despite nearly five years as an Operator.  The City points out that in reaching the decision

to fire Garcia, McNicol interviewed Garcia and the Trainees present for the startup on January 21, 2014 and reviewed Miller's files, Garcia's job description, APP procedures, City personnel rules, and DCS data.   Moreover, Mayes independently reviewed the investigation and agreed with the findings therein.   Based on her failure to control pressure not once but twice, after being shown how to do so, Garcia demonstrated she could not perform her job.   The investigation concluded that Garcia's inability to consistently and reliably operate APP without assistance elevated the risk of injury to herself and others, and recommended her termination.   Thus, the City has articulated a legitimate, nondiscriminatory business reason for firing Garcia.   *See McDonnel*, 411 U.S. at 802; *See Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n. 3 (10th Cir. 2008) ("When an employee violates an employer's policies … it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee.").

The City need not "litigate the merits of the reasoning, nor ... prove that the reason relied upon was bona fide, nor ... prove that the reasoning was applied in a nondiscriminatory fashion." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).   Instead, the City needs to simply "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Id.* (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000)).   The City has done so.

The Court finds that the City articulated a facially nondiscriminatory reason for firing Garcia.   Like the employer in *Zamora*, the City based its reasoning to fire Garcia on an investigative report.   The report concluded Garcia failed to perform essential job duties, and the failures indicated a pattern of potentially hazardous conduct.   Moreover, Garcia does not appear to legitimately dispute that a FEUS employee can be disciplined for operational failures because

16

she agrees that she made five mistakes or omissions on January 21, 2014. She agrees those mistakes or omissions could have subjected her to discipline. She even agrees the DCS records data about the sky valve when the DCS is functioning, and all testimony indicates it was indeed functioning. Garcia's Response instead focuses on ways in which the City's reasoning was allegedly pretext for discrimination.

### 2. Garcia Failed to Perform Essential Job Functions

The City next argues there is no genuine issue of material fact that Garcia failed to perform her job duties by allowing pressure to reach an unsafe threshold. Fecke, the City's expert, concluded there was no sky valve malfunction. Garcia twice failed to control steam pressure and her actions presented a safety risk to persons and property. Moreover, her actions show she either failed to appreciate the risk or disregarded the risk of her operational failures. She also failed to report and document the sky valve malfunction, which violates good engineering practices and the Operator job requirements. The City claims Garcia cannot genuinely dispute Fecke's expert conclusions because his opinions are based on objective data, and Garcia has not been disclosed in this suit to provide expert testimony. *See* Fed. R. Civ. P. 56(e) (A party opposing summary judgment cannot rest on the mere allegations or denials of her pleadings and instead must set forth additional facts showing there is a genuine dispute for trial). The City highlights that although Garcia alleges the sky valve malfunctioned and caused the pressure increase, she cannot support this claim with probative evidence. Garcia has not identified expert testimony of her own to counter Fecke's conclusions, and she has missed the deadline to do so. Indeed, Garcia admits the DCS would show the alleged malfunction, which it does not. The City contends that Garcia's self-serving disagreement with Fecke's testimony does not present a *genuine* issue of material fact.

Garcia responds that she and Reyes do not give any weight to the DCS data Fecke relies upon, and they will offer testimony to dispute Fecke's opinions.  She challenges his conclusions as "dubitable" and believes his report "devoid of substantial, evidentiary value."  She claims her testimony that the sky valve malfunctioned is sufficient to present a *genuine* disputed fact because she saw it switching from manual to auto, and Reyes is a corroborating witness who has testified similarly.  However, she does not point to any evidence in the record providing support to refute Fecke's conclusions, other than her own self-serving statements.

In the Reply, the City emphasizes that Garcia cannot rebut Fecke's expert conclusions with her own subjective testimony that belies objective data.  The question pertinent to this case is causation and whether operational failure or the sky valve malfunction caused the pressure to spike on January 21, 2014.  The City states such causation must be supported by expert testimony because it is beyond the knowledge of lay people.

Garcia has not presented sufficient evidence to overcome Fecke's expert opinions.  She simply states she and Reyes do not give any weight to Fecke's conclusions.  Summary judgment is generally not appropriate when expert testimony conflicts.  *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989).  But as the City correctly notes, neither Plaintiff nor Reyes has been designated as expert witnesses pursuant to Fed. R. Civ. P. 26(a)(2), so their testimony that they simply disagree with Fecke's conclusions will not defeat summary judgment.  Moreover, Garcia has not identified any other expert testimony that she intends to offer, and the deadline for doing so has passed.  *See* Scheduling Order (Doc. 18).  Thus, the Court agrees with the City that Garcia has not met the procedural requirements to offer, or to have Reyes offer, expert testimony on whether operator error or a malfunction caused pressure to rise on January 21, 2014.

The Court further agrees with the City that material questions involving the startup and operation of APP, as well as the functioning of the DCS and the sky valve, are beyond the knowledge and experience of lay people.  This dispute hinges on causation and whether the pressure spike on January 21, 2014 was caused by Garcia's operator error or by the sky valve malfunctioning.  To properly refute Fecke's opinions on these matters, Garcia was required to come forth with expert testimony, which she has not done.  *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004) (holding that expert testimony was required regarding whether a ballast component that controlled the heat in a fluorescent light fixture had malfunctioned and caused a fire because a jury could not reasonably infer that it did because pyrolysis was outside an average lay juror's knowledge).  Fecke's conclusion that there was no equipment malfunction and that Garcia failed to perform key job functions is undisputed.  Garcia agrees her behavior could be subject to discipline, and she agrees she made five mistakes or omissions.  She also agrees the DCS records data about the sky valve when the DCS is functioning.  All evidence in the record indicates the DCS was fully functioning on January 21, 2014.  Thus, Garcia has failed to show a genuine issue of material fact that she failed to perform essential job duties.

### 3.  Pretext

The City has met its burden to articulate a legitimate, nondiscriminatory business reason for firing Garcia, so the burden shifts back to Garcia to provide a genuine issue of material fact as to whether the City's proffered reasons are pretextual.  *See Salguero*, 366 F.3d at 1175.  Garcia has submitted no evidence that the City's explanation for her termination was pretext for discrimination on account of her gender and national origin.

The City argues Garcia cannot show pretext because it has legitimate and adequately supported reasons for firing her.  Second, Garcia has not alleged the City acted contrary to any of its policies.  Third, Garcia has no evidence a similarly situated employee was treated differently.  More specifically, Garcia cannot show a male or non-Hispanic employee was treated differently by the same supervisor for the same conduct of failing to control pressure during a startup.  *See Kendrick*, 220 F.3d at 1232.    The City points out that Title VII "prohibits only intentional discrimination *based upon* an employee's protected class characteristics." *See id.*  Moreover, "[a] company *must* be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct" since the court's role is to prevent discrimination, not to "act as a super personnel department that second guesses employers' business judgments." *Id. (*emphasis added, quotation marks omitted).  As the City maintains, it is Garcia's burden to prove other employees are similarly situated.  *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1121 n.4 (10th Cir. 2007).  The City argues she cannot show that Sims did not recommend discipline to another employee who, like Garcia, failed to control pressure during a startup.

Garcia attempts to show pretext in many ways.  First, she argues pretext is evident because there was no standard operating procedure with regards to starting APP at 5 megawatts with the damper 100% open.  She insists Miller refused to allow her to train for such a startup and that he denied her the opportunity to observe such a startup in October of 2013.

Second, Garcia challenges the City's explanation that Garcia was incapable of directing Trainees.  She claims Warner and Hill, two of the Trainees present to learn and assist, mocked and laughed at her and Reyes as pressure was rising.  She points to pretext because Warner and Hill's behavior was never investigated.  She claims such conduct should have been investigated, and relies on Sims' testimony that when a Trainee is nonresponsive to an Operator, such conduct

should be investigated.   However, Sims did not testify that Warner and Hill were being nonresponsive, or that Garcia ever alleged they were being nonresponsive.

Third, she maintains she did in fact monitor conditions throughout the plant and took remedial action as the pressure increased on January 21, 2014.   She recounts the various ways she attempted to control the situation: attempted to manipulate the malfunctioning sky valve; attempted to close the diverter damper from the computer; rolled the steam turbines to divert steam pressure; and manually closed the diverter damper.

Garcia next points to alleged discrepancies between the City's reasons for firing her and her 2012–2013 employee evaluation.   She claims the City's assertion that she was fired for failing to perform her job requirements is false because the evaluation shows she was a satisfactory employee and because Miller did not note any area in which she needed improvement.

Garcia also states that she was never disciplined as a result of the December 28, 2012 incident, so the fact that it became a central justification for her termination shows pretext.   She points out that Miller never intended his statement on that day to be disciplinary, so the City's reliance on the 2012 incident as part of the termination decision is simply unworthy of belief.

In addition, Garcia argues similarly situated white, male employees were not fired, demoted, or disciplined for similar performance deficiencies, which evinces pretext.   She claims other employees were not disciplined even when pressure rose and safety valves lifted at the plant.   Garcia specifically references an event where a white male employee at Bluffview, another FEUS power plant, failed to control drum level during a startup, and he was fired only after being demoted and failing to complete additional training.

In further attempting to show pretext, Garcia alleged the City's investigation of her conduct was a "sham" and tainted by "bias" and "alteration of witness statements," and that the City falsely stated Garcia was "divisive" and a "continual source of frustration."  Garcia alleges no one from the City ever investigated her claims that Warner and Hill mocked her and refused to help her.  She makes blanket allegations that the City did not inspect any equipment and "simply dismissed" Garcia and Reyes' claims the sky valve controller malfunctioned.  Notably, Garcia provides no evidentiary support for these claims and in fact the record appears to contradict many of these allegations.

Garcia provides a list of additional examples of pretext, but she largely fails to cite to the record or otherwise provide any basis for the allegations.  For example, she claims the City exaggerated the December 28, 2012 pressure incident because pressure of 424 psi is not "too high."  She insists there was no spike in pressure nor evidence of quickly rising pressure.  Yet, the record does not support this contention because Miller testified there *was* a spike in pressure that day, and that he intervened before pressure reached a dangerous level.   Miller's memorandum dated the same day supports this reasoning.  Fecke, the City's expert, likewise concluded the pressure event on December 28, 2012 was dangerous and constituted operator error.  Garcia does not provide evidence stating pressure of 424 psi is not too high; she merely disagrees that a pressure of 424 psi is too high.

In its Reply, the City argues Garcia cannot establish the City's proffered explanations for the termination were pretextual.  The City emphasizes that most of Garcia's ninety-one (91) Supplemental Facts are immaterial, irrelevant, hearsay, and/or improperly supported under the Federal and Local Rules.  For example, in numerous instances, Plaintiff's supplemental factual assertions are not supported by any evidence, or the evidence she relies upon stands for an

entirely different proposition, in violation of Fed. R. Civ. P. 56(c)(1)(A).   The City contends
Garcia cannot show pretext because she merely disagrees with the City's reasons for firing her.
*See Medley v. Polk Co.*, 260 F.3d 1202, 1208 (10th Cir. 2001) ("Discrimination statutes allow
employers to discharge employees for almost any reason whatsoever (even a mistaken but honest
belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged
because of an employer's honest mistake, federal anti-discrimination laws offer no protection.").

The Court is not persuaded by Garcia's arguments.   The Court's duty is not to decide
whether the City was correct in firing Garcia.   Rather, its task is to determine whether the City
terminated her for illegally discriminatory reasons.   Simply put, even if all the events Garcia
alleges with regards to pretext are true, they do not support her claim for gender and national
origin discrimination.   To establish pretext, "simply disbelieving the employer is insufficient."
*Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).   "Regardless of which
methods the plaintiff uses, "[t]he relevant inquiry is not whether the employer's proffered
reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in
good faith upon those beliefs.'"   *Macon*, 743 F.3d at 714 (quoting *Rivera v. City and County of
Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004)).

Garcia has not pointed to any evidence showing the City did not honestly believe Garcia
was incapable of performing her job requirements based on the two failures to control pressure at
APP.   While she attempts to manufacture a material dispute, the majority of her supplemental
facts flesh out the basis for her substantive allegations or they appear to characterize the City's
facts.   Moreover, the Court must look to the facts as they appear to the person making the
decision to fire Garcia.  *See Kendrick*, 220 F.3d at 1231.   It is not Garcia's subjective evaluation
of her performance that is relevant in determining pretext.  *See id.*  The undisputed evidence

shows the City decided to fire Garcia based on its belief that she twice failed to control pressure at APP during startups without intervention from others, and that such failures demonstrated a potentially hazardous pattern.

In the same vein, Garcia has not presented evidence showing Sims and McNicol's investigation was a sham, or that any discriminatory motives influenced any of the City's decisionmakers. The undisputed evidence is that Garcia was fired based on Miller, Sims, Mayes, and McNicol's belief that Garcia demonstrated on two occasions she was not capable of safely and independently operating the APP. The City investigated the January 21, 2014 incident, and relied upon those findings in deciding to fire Garcia. On January 29, 2014, a meeting took place between Miller, Garcia and Reyes, where Garcia relayed her version of events and for the first time, mentioned the sky valve malfunction. That same day, McNicol, Reyes, Miller and Garcia met, and McNicol interviewed Warner and Hill. McNicol independently investigated the incident. He interviewed those present at the startup, and Sims examined DCS control screen main steam pressure trend plots. Importantly, the sky valve was not examined because, as Garcia herself conceded, it was working properly after the alleged malfunction and Garcia did not raise the alleged malfunction until January 29–over one week after the incident. Indeed, APP was started up the day following the incident, January 22, 2014, with no problems.

There is simply no evidence supporting an inference that the City's business reasons were pretext for gender and national origin discrimination. Garcia's belief about her own performance is irrelevant. *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("Thus, the relevant "falsity" inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a

reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.").

There are no discrepancies between Garcia's 2012–2013 employee evaluation and the reasoning for her termination.  Similarly, pretext is not evident from the fact that Garcia was not disciplined for the December 2012 pressure incident.  The undisputed testimony is that Miller told Garcia what to do to rectify a pressure issue that she did not recognize, and he did not discipline her because he understood she would not commit the same mistake after being shown what to do.  Then, a little over a year later when Garcia made the same mistake and pressure rose to 451 psi, Miller and other City decisionmakers determined Garcia demonstrated a pattern of failures to control pressure when controlling pressure was a critical function of her position. *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (stating that the court should not "act as a super personnel department that second guesses employers' business judgments" (internal quotations omitted)). "Thus, we consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs*, 497 F.3d at 1119.  Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification. *Taken et al v. Okla Corp Comm.*, 125 F.3d 1366 (10th Cir. 1997).

The Bluffview event does not show pretext, because the employee was not similarly situated and the event took place approximately a decade before Garcia was fired.  Garcia fails to acknowledge the substantial factual differences between her termination and the other employee's circumstances.  The employee did not engage in similar conduct when he failed to control drum level, and he worked at a different power plant under a different supervisor who made the ultimate termination decision. *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th

25

Cir. 2006) ("In other words, a plaintiff must show that she was similarly-situated to the comparator employees in all relevant respects."  Moreover, the event Garcia points to occurred nearly a decade before she was fired, which significantly diminishes its evidentiary value.  *See Kendrick*, 220 F.3d at 1234 (Employers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs.").  Even if the male employee was similarly situated, he was demoted and then fired, in contrast to Garcia who was not demoted after her first failure to control pressure.  Like the male employee, Garcia was fired only after she had additional training and experience, and still failed to properly start up the plant nearly one year later.

In addition to the Bluffview event, Garcia makes a bald assertion that other employees make mistakes but are not punished as severely as Garcia was.  The fact that other FEUS employees may have made errors during plant startups does not establish pretext because there is no evidence any other employee failed to control pressure during a startup of APP.  Moreover, there is no evidence any other pressure problems were due to employee error.  *See Kendrick*, 220 F.3d at 1232.  "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." *Kendrick*, 220 F.3d at 1232 (10th Cir. 2000) (quoting *Flasher Co.*, 986 F.2d at 1319).

Finally, the Court makes several observations about deficiencies in Plaintiff's briefing. As the City has noted, Garcia offers her own lengthy set of Supplemental Facts detailing all of the incidents that form the basis for her discrimination and retaliation claims.  Many of these facts are immaterial, and the Court has omitted them.  In addition, Plaintiff repeatedly fails to

comply with this Court's local rule governing summary judgment motions.  The Court omitted Plaintiff's Supplemental Facts that are not properly supported by the attached evidence as required by Fed. R. Civ. P. 56(c)(1)(A) and D.N.M.LR-Civ. 56(b).  As an example, in Supplemental Fact 24, Garcia contends that on December 28, 2012, Miller "merely went to Garcia" and stated she "could put the sky valve in auto."  However, the portion of Miller's deposition that Garcia cites does not address whether Miller told Garcia she could put the sky valve in auto.  The deposition actually refers to procedures for starting up APP.  As another example, in Plaintiff's Supplemental Fact 33, Garcia claims that before January 21, 2014, she had never been trained how to conduct a startup at 5 megawatts and diverter damper 100% open, "no operating procedure explained such a startup, and Miller had denied her the opportunity in October 2013 to observe such a startup."  Garcia refers to a portion of her own deposition to support this statement.  However, in Garcia's deposition excerpt, she explains there was no standard operating procedure for the 100% diverter damper position, and that Reyes was requesting one.  Nowhere does the referenced deposition excerpt state that she had never been trained in such a startup or that Miller denied her the opportunity to observe one.  *See* D.N.M.LR-Civ. 56(b) ("Each additional fact … must refer with particularity to those portions of the record upon which the non-movant relies.").

There are also numerous instances where Plaintiff fails entirely to provide evidence in support of her Supplemental Facts.  For example, in Fact 36, Garcia claims she asked Warner what needed to be done prior to the startup on January 21, 2014 but that Warner stated, "I don't know."  Garcia refers to a portion of Exhibit 17 (Miller's deposition) that is not attached to Plaintiff's Response.  And in Fact 47, Garcia claims there is no record that anyone at the City investigated Garcia and Reyes' allegations that Warner and Hill refused to assist in the January

21, 2014 startup and that they mocked the women and were uncooperative.  Yet, Garcia provides no citation to the record to support this fact.  Most egregiously, in Supplemental Fact 72, Garcia quotes a lengthy passage from an e-mail she claims McNicol wrote.  She cites to Exhibit 24, yet the quoted passage does not appear anywhere in Exhibit 24.

The Court has not considered any of Plaintiff's purported facts when she has not complied with the Federal Rules of Civil Procedure and this Court's local rule.  *See* Fed. R. Civ. P. 56(c)(1)(A) and D.N.M.LR-Civ. 56(b).  Although the Court views the facts in a summary judgment motion favorably to the non-movant, there is no requirement that the Court do the work of Plaintiff's counsel and sift through the record in an attempt to find support for Plaintiff's factual allegations.  *See Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [plaintiff's] arguments for him.").

## II.     Motion for Summary Judgment on Garcia's Retaliation Claim

Garcia has not met her burden to show the City's legitimate, nondiscriminatory reason for terminating her was pretextual, and has thus failed to meet her burden under the *McDonnel Douglas* framework.

Count III of the Complaint alleges Garcia's termination violated the anti-retaliation provisions of Title VII.  She states she engaged in protected activity when she filed *Garcia I*, alleging discrimination and retaliation related to the terms and conditions of her employment. She claims there is a causal connection between filing *Garcia I* and the City's termination of her employment two years later.  The City concedes that the termination of employment is an adverse action and that filing *Garcia I* was protected activity.  *See generally Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (defining adverse action to include "acts that constitute a

significant change in employment status … such firing).   Thus, the Court examines the third prong of Garcia's retaliation claim: whether there is a causal connection between the protected activity and her termination.  *See Meiners*, 359 F.3d at 1229.

The City argues that other than filing *Garcia I* in 2012, Garcia does not assert that she engaged in any other protected activity.  Thus, the only allegedly protected activity at issue in this case is Garcia's act of filing her complaint in *Garcia I,* an act that occurred on April 13, 2012. *See Heiman v. United Parcel Service, Inc.*, 12 Fed.Appx. 656, *7 (10th Cir. 2001) ("Protected activity is the bringing of charges; it is not serving an employer with a formal lawsuit or receiving an employee's [EEOC] complaint."); *Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259 (10th Cir. 1994) (noting that the temporal proximity runs from the "bringing" of charges).  The City points out that nearly two years passed between Plaintiff filing *Garcia I* on April 13, 2012 and her termination from FEUS on February 10, 2014, so Garcia must rely on additional evidence beyond the temporal proximity to establish causation, which she cannot do. *See Meiners*, 359 F.3d at 1231 (holding that a three-month period, standing alone, is insufficient to show causation); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ([U]nless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.").

Garcia responds that she can show retaliation because her termination occurred in the midst of the *Garcia I* litigation.  Essentially, because *Garcia I* was in "full-blown litigation" when she was fired, the City must have fired her in retaliation for filing the suit.  She claims the relevant inquiry is that *Garcia I* was pending at all times relevant to Garcia's claims in this matter.  Plaintiff points to *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) and *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205 (10th Cir. 2003), to support her

contention that when a lawsuit is pending at the time of the adverse action, and is not temporally far from the depositions of the decisionmakers, a plaintiff has established retaliation.

In its Reply, the City correctly points out that Garcia's reliance on *Anderson* and *Wells* is misplaced. Those cases do not stand for the proposition that an ongoing lawsuit expands the temporal scope of the protected activity. In *Wells*, there was a five-month gap between the employee filing a Center for Equal Employment Opportunity charge and the adverse employment action. 325 F.3d at 1216. The employee had been on leave for most of the five-month period and was reassigned only seven days after her return. *See id.* The Tenth Circuit pointed out that the employer could not have retaliated against the employee earlier because she was on leave. *See id.* at 1217. The Court reasoned a "five-month gap between a protected activity and an adverse action would ordinarily be too great a time lapse to support an inference of causation based on timing alone." *See id.* The Court held that a jury could reasonably infer retaliation because, despite the five-month gap, the employee was transferred mere days after her return to work. *See id.* In *Wells*, the Court never focused on the ongoing litigation between the plaintiff and her employer. *Wells* is inapposite to the present case, where Garcia remained at work for the entire time from April 13, 2012 until she was fired on February 10, 2014.[9]

The Court finds Garcia's retaliation claim fails as a matter of law under the third prong of the burden-shifting analysis. Garcia has not shown a causal connection between her protected activity and the adverse employment action. *See Meiners*, 359 F.3d at 1229. "Title VII retaliation claims must be proved according to traditional principles of but-for causation …proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful

---

[9] *Anderson* is similarly inapposite. There, the Tenth Circuit emphasized when more than three months passes between the protected activity and the adverse employment decision, a "plaintiff must rely on additional evidence beyond temporal proximity to establish causation." 181 F.3d at 1179. In *Anderson* the Court held there was sufficient proximity because the proximity was under three months, which is clearly less than the nearly two-year period at issue here.

action or actions of the employer." *Nassar*, 133 S.Ct. at 2533.  Garcia has no such proof here, which proves fatal to her claim.  The Court agrees with the City that Garcia is unable to direct the Court to any evidence that supports an inference that but-for her filing a complaint in *Garcia I*, she would not have been terminated.  It is undisputed that Garcia's explanation for the alleged retaliation is her termination on February 10, 2014 following the civil complaint she filed on April 13, 2012.  As a matter of law, this nearly two-year period is not sufficient to establish that her complaint was the but-for cause of her termination.  *See Nassar*, 133 S.Ct. at 2533. Moreover, Garcia cannot point to other evidence to establish causation.  Plaintiff claims she was fired within a few months of depositions in *Garcia I*, and Plaintiff refers to the cover pages of those depositions.  But Plaintiff is mistaken.  The cover pages show that *every single* deposition referenced was taken in January 2016–nearly two years after Garcia was fired.  Garcia cites no law that supports her proposition that a pending lawsuit, standing alone, expands the temporal scope required to show retaliation.  The depositions are not material to Garcia's retaliation claim, and she has no other evidence of retaliation.  Therefore, even viewing these facts in the light most favorable to Garcia, she cannot establish the third element of her prima facie case of retaliation, so the Court dismisses the claim.

Accordingly, the Court finds that City's Motion for Summary Judgment is well-taken, and therefore **GRANTED**.  Plaintiffs' claims are hereby dismissed **WITH PREJUDICE**.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

31